**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF TEXAS**

**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ZDENKA WILCOX,** | § | **Civil Action No. 4:26-cv-147** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CITY OF SOUTHLAKE, TEXAS;** | § | |
| **JOHN/JANE DOES 1–5,** | § | |
| in their individual and official capacities, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1. This civil-rights action arises from Defendants' creation, maintenance, and continued official use of materially inaccurate police records concerning Plaintiff's report of domestic violence, combined with Defendants' refusal to provide any meaningful process by which those records could be reviewed, corrected, or challenged.

2. Plaintiff does not assert a freestanding right to an error-free police report or to compel any particular investigative outcome. Nor is this a claim for reputational harm alone. This case

1

arises from the State's handling of Plaintiff's reports of domestic violence and the subsequent use of materially inaccurate information derived from those reports in official proceedings. Rather, this action challenges the City's transformation of materially inaccurate information into an authoritative official record, its continued maintenance of that record after notice of its falsity, and its use of that record in official proceedings without constitutionally adequate procedural safeguards.

3. After Plaintiff reported domestic violence to the Southlake Police Department, Defendants generated official records that contained material inaccuracies, including incident dates that Plaintiff did not provide and that were not derived from any information given during her report, materially altering the meaning and credibility of Plaintiff's statements in official records.

4. The photographs provided by Plaintiff were printed images and did not contain any embedded metadata or dates identifying when the incidents occurred.

5. Body-worn camera footage of Plaintiff's initial report confirms that Plaintiff did not provide specific incident dates, and no such dates were stated during the recorded interaction.

6. Plaintiff obtained the body-worn camera footage through a Texas Public Information Act request after the City initially refused disclosure and sought to withhold responsive records. The Texas Attorney General rejected the asserted bases for withholding and ordered the release of the footage, along with related internal communications and reports that had likewise been withheld.

7. Plaintiff repeatedly sought clarification, review, and correction of those inaccuracies, including escalating her requests to supervisory and policymaking officials within the City and through counsel. Despite these efforts—and despite formal notice through Plaintiff's

2

then-counsel, Debra Edmondson, specifically identifying the material inaccuracies incorporated into the report and the resulting legal harm and liberty-interest consequences—Defendants provided no meaningful mechanism for neutral review, correction, annotation, or challenge.

8. The deprivation alleged here did not arise from a single recording error. It arose from Defendants' continued maintenance and use of materially inaccurate official records after receiving specific notice of their inaccuracies, combined with the absence of any constitutionally adequate process to challenge or correct those records.

9. After receiving notice—including written communications, supporting documentation, and body-worn camera evidence—Defendants knew that the information contained in the official records was materially inaccurate, yet deliberately chose to maintain and rely upon those inaccuracies. This conduct was not the result of negligence, mistake, or oversight, but of deliberate decisions made after actual knowledge of the inaccuracies.

10. These were not ambiguous discrepancies but material inaccuracies that altered the meaning and reliability of Plaintiff's reported statements. These inaccuracies included unsupported inferences that were inconsistent with the underlying evidence and the observable characteristics of the reported injuries. Defendants' continued reliance on these material inaccuracies after acquiring actual knowledge of their existence was a direct and foreseeable cause of the subsequent use of those records in judicial proceedings.

11. The official police records at issue are government-created records that carry institutional authority and are routinely relied upon by courts, prosecutors, and other state actors. Defendants ensured the continued availability and official use of these materially inaccurate records despite repeated notice and requests for correction.

12. As a direct and foreseeable result, those records were relied upon in judicial proceedings affecting Plaintiff's legal rights, including proceedings involving her parental interests, where a Southlake Police Department detective relied on the inaccurate records and testified in a manner that conveyed that Plaintiff's domestic-violence reports were false or not credible. This reliance undermined Plaintiff's credibility, distorted the evidentiary record, and exposed Plaintiff to adverse legal consequences, including ongoing litigation harm and the risk of incarceration.

13. Despite formal written notice detailing the inaccuracies and resulting harm, City officials and supervisory personnel failed to correct the records, failed to initiate any meaningful investigation, and failed to provide any mechanism for review or redress. This deliberate inaction, despite actual knowledge and authority to act, resulted in the continued maintenance and official use of materially inaccurate records and constitutes ratification of that conduct as official municipal policy.

14. The Constitution does not require perfection in police recordkeeping. However, once the State knowingly maintains and uses materially inaccurate official records in a manner that imposes a stigmatizing designation and carries legal consequences, it must provide constitutionally adequate procedural safeguards, including a meaningful opportunity for review and correction. The Due Process Clause prohibits the State from doing otherwise.

## II. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

16. Jurisdiction is proper under 28 U.S.C. § 1343(a)(3)–(4).

17. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201–2202.

18. Venue is proper under 28 U.S.C. § 1391(b).

### III. PARTIES

#### A. Plaintiff

19. Plaintiff Zdenka Wilcox is a resident of Southlake, Texas, and at all relevant times was a person within the jurisdiction of the United States entitled to the protections of the Constitution and laws of the United States.

#### B. Municipal Defendant

20. Defendant City of Southlake, Texas ("City") is a municipal corporation organized under the laws of the State of Texas and is a "person" subject to liability under 42 U.S.C. § 1983.

21. The City, through its policymakers, including but not limited to the Chief of Police, the City Manager, members of the City Council, and other senior officials responsible for law enforcement operations, is responsible for establishing, implementing, and maintaining the policies, practices, customs, training, supervision, and recordkeeping systems of the Southlake Police Department ("SLPD").

22. Upon information and belief, Plaintiff provided notice of the issues described herein to multiple City officials, including at least one member of the City Council. Despite receiving detailed notice of material inaccuracies and the resulting legal consequences, no corrective action was taken.

23. The City's failure to act in the face of such notice, including the failure of officials to take corrective action or to refer the matter through appropriate channels within the City's governance structure, reflects deliberate indifference and/or ratification of the conduct described herein.

#### C. Individual Defendants

5

24. At all relevant times, each Individual Defendant was employed by the City of Southlake and acted under color of state law within the course and scope of their employment with the Southlake Police Department ("SLPD").

25. Each Individual Defendant is sued in both their individual and official capacities.

**1. Line Officer Defendant**

26. Defendant Officer Braeden Whitman was the responding officer who took Plaintiff's March 19, 2024 domestic-violence report and generated the initial official police records associated with case number SPR24000349.

27. In doing so, Officer Whitman created and entered official records that contained material inaccuracies, including information not provided by Plaintiff, thereby introducing inaccurate or misleading information into official government records.

**2. Investigative Defendant**

28. Defendant Detective Roberson was an SLPD detective assigned to Plaintiff's case and participated in the investigation, evaluation, and handling of Plaintiff's report.

29. Detective Roberson relied upon, adopted, and/or failed to correct materially inaccurate information contained in official police records, and participated in the continued use and dissemination of those records, including in communications with third parties and in connection with judicial proceedings.

**3. Supervisory Defendant**

30. Defendant Captain Jason Henninger was a supervisory officer within SLPD with authority over investigative and administrative functions relevant to Plaintiff's case.

31. Captain Henninger communicated directly with Plaintiff regarding the accuracy and potential amendment of the police report and had actual notice of Plaintiff's repeated requests to correct material inaccuracies.

32. Despite such notice and authority to act, Captain Henninger failed to take steps to ensure correction, annotation, or meaningful review of the inaccurate records, thereby contributing to their continued maintenance and official use.

**4. Policymaker Defendant**

33. Defendant Chief Ashleigh Casey was, at all relevant times, the Chief of Police for SLPD and a senior official responsible for law enforcement operations, supervision, and departmental practices.

34. Chief Casey exercised final policymaking authority with respect to law enforcement practices, supervision, discipline, and recordkeeping procedures for the Southlake Police Department, or, at a minimum, acted as a final decision-maker whose actions and inactions were ratified by officials with such authority.

35. Chief Casey had authority to establish, implement, approve, or correct departmental practices concerning the creation, maintenance, and handling of official police records.

36. Despite actual or constructive notice of the issues raised by Plaintiff, including escalation of concerns within the City, Chief Casey failed to implement or ensure the availability of any constitutionally adequate mechanism for correcting or challenging materially inaccurate police records, and failed to take corrective action in Plaintiff's case.

**5. Records / Administrative Defendant**

37. Defendant Sarah Blum was a records manager or administrative official responsible for maintaining and processing requests for access to SLPD records, including the records at issue in this case.

38. Ms. Blum participated in handling Plaintiff's requests for records related to her case, including requests made pursuant to the Texas Public Information Act.

39. Upon information and belief, Ms. Blum escalated or contributed to the decision to withhold responsive records and delay their release, despite the absence of a valid legal basis for withholding such information.

40. As a result, Plaintiff was denied timely access to records necessary to identify and challenge material inaccuracies, further prolonging the continued maintenance and use of those inaccuracies.

**D. Doe Defendants**

41. Defendants John/Jane Does 1–5 are officers, supervisors, investigators, records personnel, legal advisors, or policymakers employed by or acting on behalf of the City who participated in the creation, review, approval, maintenance, dissemination, or failure to correct the materially inaccurate records described herein.

42. These Defendants also include individuals who, upon information and belief, were involved in decisions to withhold, delay, or deny access to records and/or failed to take corrective action after receiving notice of the inaccuracies.

43. The true names and capacities of these Defendants are presently unknown to Plaintiff but are within the possession, custody, or control of Defendants.

44. Plaintiff will seek leave to amend this Complaint to substitute the true identities of these Defendants once they are ascertained.

## IV. FACTUAL BACKGROUND

### A. Initial Report and Creation of Official Records

45. On or about March 19, 2024, Plaintiff reported domestic violence to the Southlake Police Department.

46. Officer Braeden Whitman responded to Plaintiff's report and generated official police records associated with case number SPR24000349.

47. During this initial interaction, Plaintiff provided information and supporting documentation concerning the reported incidents.

48. The official records generated from this interaction included specific incident dates that were not provided by Plaintiff and were not derived from any statements made by Plaintiff during the report.

49. The photographs documented physical injuries consistent with reported domestic violence, including visible bruising and discoloration, which exhibited characteristics indicating that the injuries were not contemporaneous with the dates later attributed to them in the official records.

50. Despite the absence of any identified source for those dates and the inconsistency with the observable condition of the injuries, the dates were incorporated into the official report as factual assertions, thereby altering the substance, context, and apparent credibility of Plaintiff's allegations.

51. Body-worn camera footage of the initial report reflects that Plaintiff did not provide specific incident dates during the interaction, and no such dates were stated by Plaintiff at that time.

52. The inclusion of these dates in the official records created a material discrepancy between Plaintiff's actual statements and the contents of the official report.

53. This discrepancy was material because it directly affected how Plaintiff's allegations were interpreted, evaluated, and relied upon by law enforcement and other decision-makers.

**B. Plaintiff's Evidence and Efforts to Engage Law Enforcement**

54. During the initial report and subsequent communications, Plaintiff provided supporting evidence and information to law enforcement concerning the reported incidents.

55. This evidence included photographs depicting physical injuries consistent with domestic violence. These photographs were printed images and did not contain embedded metadata or electronically generated timestamps.

56. The only dates associated with the photographs were the dates reflected on the printed images themselves, which corresponded to when the photographs were taken, not when the underlying incidents occurred.

57. During the initial interaction, Plaintiff explained that the photographs were taken after the perpetrator had left the residence and that they were the only surviving documentation of the abuse.

58. The photographs depicted visible bruising and injury patterns, including discoloration and yellowing, indicating that the injuries were not contemporaneous with the dates reflected on the photographs.

59. Despite this context, the dates reflected on the photographs were treated as incident dates in the official records.

60. Plaintiff continued to provide information, clarification, and supporting materials to law enforcement in an effort to ensure that her report was accurately understood and properly evaluated.

61. These efforts included direct communications with responding and supervisory officers, as well as the submission of additional information intended to clarify the timing and nature of the reported incidents.

62. Despite these efforts, Plaintiff's explanations and supporting evidence were not incorporated into any meaningful correction, clarification, or annotation of the official records, and Plaintiff was not provided any mechanism or process—formal or informal—by which she could seek review, correction, or challenge of the inaccuracies in those records.

**C. One-Sided Engagement with Juan Duran and False-Report Theory**

63. Following the creation of the official records, Defendants engaged in communications and investigative activity concerning Plaintiff's report, including interactions with third parties, including Juan Duran.

64. Upon information and belief, Defendants solicited, received, and relied upon statements or information from Juan Duran concerning the allegations reported by Plaintiff.

65. In doing so, Defendants considered and advanced a theory that Plaintiff's report was false or not credible, based in part on the incident dates reflected in the official records.

66. These dates, which had not been provided by Plaintiff and did not reflect the timing of the underlying incidents, were used to evaluate Plaintiff's allegations and to support the conclusion that her report was inconsistent or unreliable.

67. Defendants relied upon these inaccuracies in assessing Plaintiff's credibility and in determining how to proceed with the investigation and related actions.

68. At the same time, Plaintiff was not provided any meaningful opportunity to respond to, rebut, or correct allegations that her report was false, and was not contacted regarding such allegations. Plaintiff was not provided any mechanism to respond to or challenge the

information being relied upon in any escalation of the matter to prosecutorial authorities, nor was she afforded any opportunity to address or participate in decisions affecting the evaluation of her report, including the use of inaccurate dates and the conclusions drawn from them.

69. This imbalance extended beyond the acceptance of competing accounts to the structure of the process itself. Defendants relied on information adverse to Plaintiff, including conclusions drawn from inaccurate dates contained in official records, while failing to provide Plaintiff with notice of such adverse determinations or any opportunity to respond to or correct those conclusions.

70. As a result, Plaintiff was excluded from meaningful participation in the evaluation of her own report, while adverse determinations regarding her credibility were formed, adopted, and maintained based on inaccurate information contained in official records.

71. Defendants' reliance on inaccurate information, combined with their acceptance of contrary information from Juan Duran without providing Plaintiff a comparable opportunity to respond, resulted in a one-sided evaluative process that contributed to the development and adoption of a narrative that Plaintiff's report was false or not credible, which was then maintained and used in subsequent proceedings.

**D. Continued Maintenance of Inaccurate Records and Failure to Correct**

72. Plaintiff repeatedly sought clarification, review, and correction of the police report and associated records.

73. Defendants submitted or referred the matter to the Tarrant County District Attorney's Office for potential criminal charges related to alleged false reporting based on the materially inaccurate records described herein. At no point prior to or during this escalation did

Defendants provide any mechanism by which Plaintiff could review, challenge, or respond to the information being relied upon.

74. Plaintiff's requests for correction and review were directed to multiple levels of authority within the City, including supervisory personnel, command staff, the Chief of Police, and City officials with authority to direct corrective action, yet no meaningful review, correction, or annotation of the records occurred.

75. On or about September 17, 2025, Plaintiff communicated with SLPD personnel and referenced a prior phone conversation with Captain Jason Henninger.

76. Plaintiff was informed during that prior conversation that the report had been amended to reflect her statements. However, when Plaintiff later obtained the records, she did not observe any such amendments.

77. Plaintiff subsequently requested clarification regarding what amendments had been made, when they were made, and how they were reflected in the official report, but did not receive a meaningful response.

78. Plaintiff further requested that the report be corrected to accurately reflect the statements she made to Officer Whitman, including those captured on body-worn-camera footage.

79. Despite these requests and escalation to officials with authority to act, no corrective action was taken, the materially inaccurate records remained in official circulation, and Plaintiff was not provided any mechanism by which she could obtain neutral review or correction of the records.

80. The continued maintenance of the records in their materially inaccurate form was not a one-time error, but an ongoing condition that persisted after repeated notice. Defendants did not merely create inaccurate records—they continued to maintain and rely upon those records

after acquiring knowledge of their inaccuracies, without providing any mechanism for Plaintiff to challenge or correct them. This ongoing conduct resulted in the continued use of the records in official proceedings and the imposition of concrete legal consequences on Plaintiff, as described herein.

### E. Use of Records in Judicial Proceedings

81. As a direct and foreseeable result of Defendants' continued maintenance of materially inaccurate records after notice of their inaccuracies, those records were relied upon in judicial proceedings in Tarrant County, Texas, including proceedings affecting Plaintiff's parental rights and related legal interests. The records were used as authoritative government accounts in those proceedings.

82. In those proceedings, Southlake Police Department Detective Roberson relied on the materially inaccurate records and provided testimony based on those records in a manner that reflected or reinforced the conclusion that Plaintiff's domestic-violence reports were false or not credible.

83. This reliance and testimony undermined Plaintiff's credibility, distorted the evidentiary record, and exposed Plaintiff to adverse legal consequences, including ongoing litigation harm and the risk of incarceration. This included the distortion of Plaintiff's reports of domestic violence and the credibility of the underlying allegations.

84. As a result, Plaintiff's credibility was impaired in court, and she suffered tangible legal consequences, including being required to defend against allegations of false reporting in judicial proceedings, incurring substantial legal expenses, and facing potential findings that could have resulted in sanctions, contempt, or other adverse rulings affecting her rights and interests.

85. The same police records have also been invoked in ongoing civil litigation in Tarrant County, Texas, where they are used as purported official confirmation that Plaintiff fabricated her report, requiring Plaintiff to expend significant financial resources to defend against those claims and exposing her to continuing legal and evidentiary burdens.

86. These uses of the records demonstrate that they carried institutional authority and were relied upon by government actors and courts.

87. The official use of these records in judicial proceedings transformed the stigmatizing designation into a concrete legal burden, implicating Plaintiff's protected liberty interests.

88. The constitutional injury arose not from the initial existence of an inaccurate report alone, but from Defendants' continued maintenance and official use of that record after notice of its inaccuracies.

89. The use of these records imposed a state-created legal disability by causing Plaintiff to be treated in judicial proceedings as having made false or unreliable reports, thereby altering her legal position, burdening her ability to assert her rights, and exposing her to potential sanctions, contempt findings, and adverse rulings affecting her parental and liberty interests.

90. Absent Defendants' continued maintenance of the records in their inaccurate form after notice, those records would not have carried the same authoritative weight in subsequent proceedings.

**F. Notice to City Officials and Ratification**

91. On or about January 30, 2026, Plaintiff, through counsel, provided formal written notice to the City of Southlake, its City Attorney, City Manager, and senior officials.

92. That notice identified the alleged inaccuracies in the police records, the resulting legal harm, and the need for corrective action.

93. Despite receiving this notice, no records were corrected, no investigation was initiated, and no meaningful remedial process was provided. The records remained unchanged and continued to be maintained in official files available for use and reliance by law enforcement, prosecutors, courts, and other governmental actors.

94. In addition to formal written notice, Plaintiff directly contacted City Councilmember Kathy Talley regarding the issues described herein. Plaintiff sent an email detailing concerns about materially inaccurate police records and the absence of any mechanism for correction. Plaintiff did not receive a response. In or about October or November 2025, Plaintiff spoke with Councilmember Talley and inquired about the lack of response. Councilmember Talley initially indicated that she did not recall the communication, but then acknowledged the email and stated, in substance, that she had been advised not to respond.

95. The continued maintenance and availability of the records after notice resulted in their ongoing use and the continued imposition of legal consequences on Plaintiff.

96. The records have been used in ongoing civil litigation, including a pending civil action in Tarrant County, Texas, Cause No. 141-358707-24, where they are presented and relied upon as authoritative government accounts, thereby imposing continuing legal and evidentiary burdens on Plaintiff.

97. By failing to take corrective action after actual notice, Defendants ratified the continued maintenance and use of the inaccurate records as official municipal conduct.

**G. Policy Environment**

98. The City of Southlake represents that its Police Department operates under formal policies, training, and accountability standards, including accreditation through the Commission on Accreditation for Law Enforcement Agencies (CALEA).

99. Upon information and belief, SLPD maintains written policies and supervisory practices governing recordkeeping, investigation, and the handling of domestic-violence reports.

100. Despite these claimed standards, Defendants maintained materially inaccurate records, failed to provide any meaningful corrective process, and continued to allow those records to be used with official authority after notice of their inaccuracies.

101. The absence of any meaningful review, annotation, or correction mechanism for known materially inaccurate official records was not an isolated deficiency, but an ongoing condition that persisted after repeated notice to City officials with authority to act.

102. This conduct reflects either the absence of constitutionally adequate corrective procedures or the City's failure to implement such procedures despite actual knowledge of the need to do so, resulting in the continued maintenance and use of materially inaccurate records in official proceedings.

103. As a direct and foreseeable result of Defendants' creation, maintenance, and continued reliance on materially inaccurate records after notice, Plaintiff suffered concrete legal harm, including impairment of her credibility in judicial proceedings, adverse use of official records in proceedings affecting her parental interests, and exposure to adverse legal consequences, including the risk of incarceration and the imposition of concrete legal burdens affecting Plaintiff's rights and position in those proceedings.

## VI. CLAIMS FOR RELIEF

104. COUNT I
VIOLATION OF FOURTEENTH AMENDMENT - PROCEDURAL DUE PROCESS
(STIGMA-PLUS)
(42 U.S.C § 1983)
   (a) Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

17

(b) This claim does not arise in the employment context, and the 'plus' requirement is satisfied where government action imposes a tangible legal burden through official use of stigmatizing information in judicial or quasi-judicial proceedings outside the employment context.

(c) Defendants, acting under color of state law, deprived Plaintiff of protected liberty interests without constitutionally adequate process, including Plaintiff's liberty interest in avoiding the State's use of materially inaccurate information in proceedings affecting her legal rights, parental interests, and risk of incarceration, as well as her ability to seek protection and legal recourse based on her reports of domestic violence.

(d) Plaintiff does not assert a freestanding right to an error-free police report. Rather, Plaintiff challenges Defendants' creation, continued maintenance, and official use of materially inaccurate information in government records, after notice of its falsity, combined with the absence of any meaningful process to review, correct, annotate, or challenge those records.

(e) Defendants created and maintained official records that portrayed Plaintiff as unreliable, untruthful, or as having made false reports, thereby imposing a stigmatizing designation through official government action, including the right not to be subjected to the State's knowing use of materially inaccurate information in proceedings that affect liberty interests.

(f) This stigma was coupled with tangible and legally significant consequences. Defendants ensured the continued availability and official use of these records, and

those records were relied upon in judicial proceedings affecting Plaintiff's legal rights, including proceedings involving her parental interests.

(g) As a direct result of Defendants' creation, continued maintenance, and refusal to correct materially inaccurate official records, Plaintiff suffered concrete and legally significant consequences, including adverse credibility determinations in judicial proceedings, being required to defend against allegations that she made false reports in court, incurring substantial legal expenses, and exposure to adverse rulings, sanctions, and potential incarceration.

(h) These harms constitute a deprivation of liberty interests sufficient to satisfy the "stigma-plus" doctrine.

(i) The official police records at issue constitute state-created records carrying institutional authority, and their continued maintenance and use imposed a state-created legal disability on Plaintiff by altering how courts and other governmental actors evaluated her credibility and legal position in proceedings affecting her rights.

(j) Once Defendants created, maintained, and used materially inaccurate information in a manner that imposed stigma and legal consequences, they were required to provide constitutionally adequate procedural safeguards, including a meaningful opportunity to be heard at a meaningful time and in a meaningful manner for neutral review, correction, annotation, or challenge of the records.  The absence of any meaningful opportunity for neutral review or challenge extended to all stages at which Defendants relied on materially inaccurate information, including its use in processes capable of affecting Plaintiff's liberty interests.

(k) Despite repeated and specific notice of the inaccuracies—including formal notice through counsel identifying both the falsity of the records and the resulting harm—Defendants, despite having actual knowledge of the material inaccuracies and the resulting harm, including knowledge that such inaccuracies resulted from unsupported inferences not grounded in the underlying evidence, failed to provide any pre-deprivation or post-deprivation process.

(l) Plaintiff repeatedly sought correction and review, including escalation to supervisory and policymaking officials, yet Defendants provided no mechanism for review or redress and allowed the records to remain in official circulation and to be relied upon in legal proceedings.

(m) The deprivation did not result from a random or unauthorized act, but from Defendants' established practices, policies, and ratified conduct, including the absence of any procedure to correct known inaccurate official records and the continued reliance on such records after notice.

(n) The rights violated were clearly established at the time of Defendants' conduct, including the right not to be subjected to the State's knowing use of materially inaccurate or misleading information in proceedings affecting liberty interests, and the right to a meaningful opportunity to be heard at a meaningful time and in a meaningful manner to challenge such information, as reflected in long-standing due process principles prohibiting the use of materially false or misleading information by the State in adjudicative contexts.

(o) Defendants' conduct violated Plaintiff's clearly established right not to be subjected to the State's knowing maintenance and use of materially inaccurate information in

proceedings affecting her liberty interests without a meaningful opportunity to challenge that information.

(p) Defendants' conduct violated Plaintiff's right to procedural due process under the Fourteenth Amendment.

105. COUNT II
Municipal Liability (Monell)

(a) Plaintiff incorporates all preceding paragraphs, including Count I.

(b) Plaintiff does not seek to impose liability based on respondeat superior, but on the City's own policies, customs, and ratified conduct.

(c) The constitutional violations committed by the Individual Defendants, as described in Count I, were caused by official municipal policy, municipal practice, deliberate indifference, and ratification by final policymakers of the City of Southlake.

(d) At all relevant times, the City, through its Police Department and policymakers, maintained policies, practices, and customs governing the creation, maintenance, and use of official police records.

(e) The City maintained a policy, practice, or custom of continuing to maintain and rely upon materially inaccurate or misleading police records after receiving notice of their inaccuracies, without providing any constitutionally adequate mechanism for neutral review, correction, annotation, or meaningful challenge.

(f) This policy or custom is demonstrated by Defendants' repeated failure to correct or review the records despite specific notice of material inaccuracies and resulting harm.

(g) This conduct was not a random or unauthorized act of a single employee. Rather, multiple City officials across different levels of authority—including supervisory personnel, command staff, and policymakers—received actual notice of the material

inaccuracies and failed to take corrective action. This included direct notice to a City Councilmember, who acknowledged receipt of Plaintiff's concerns but did not respond after being advised not to do so. These facts reflect a coordinated and ratified course of conduct attributable to the City.

(h) The City further maintained practices under which officers and investigators were permitted to incorporate, rely upon, and reinforce inaccurate or unsupported information in official records—including incident dates not provided by Plaintiff and not derived from any identifiable source—without verification, correction, or procedural safeguards.

(i) These practices allowed materially inaccurate information to be incorporated into official records, maintained as authoritative, and later relied upon in judicial proceedings without any mechanism for correction.

(j) This failure constitutes deliberate indifference to the known and obvious risk that materially inaccurate records would be used in judicial proceedings to the detriment of individuals' constitutional rights.

(k) In addition, the City failed to adequately train and supervise its officers and personnel regarding the accurate documentation, verification, review, and correction of police reports, despite the obvious and foreseeable risk that inaccurate records would be relied upon in judicial and prosecutorial decision-making.

(l) The need for such training and procedures was obvious, as police reports are routinely treated as authoritative by courts, prosecutors, and other governmental actors, and inaccuracies in such records foreseeably result in constitutional harm.

(m) Despite this known and obvious risk, the City failed to implement or enforce constitutionally adequate procedures to ensure accuracy, review, or correction of official records.

(n) City officials with final policymaking authority received actual notice of the inaccuracies and the resulting harm to Plaintiff.

(o) Plaintiff's requests for correction and review were directed to multiple levels of authority, including supervisory personnel, the Chief of Police, and other City officials with authority to direct corrective action.

(p) Despite possessing authority to act, these officials failed to correct the records, failed to initiate a meaningful investigation, and failed to provide any corrective process, allowing the records to remain in official circulation and to be relied upon in legal proceedings.

(q) This deliberate inaction, despite actual knowledge, constitutes ratification of the continued maintenance and use of materially inaccurate records as official municipal policy.

(r) The City's policies, customs, practices, failures to train and supervise, and ratified conduct were the moving force behind the constitutional violations suffered by Plaintiff, thus satisfying the requirements for municipal liability under 42 U.S.C. §1983.

## VII. INJUNCTIVE AND DECLARATORY RELIEF

106. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

107. Plaintiff seeks prospective declaratory and injunctive relief to address ongoing constitutional violations arising from Defendants' continued maintenance and availability of materially inaccurate official police records.

108. The records at issue remain in official files and continue to be available for use and reliance by law enforcement, prosecutors, courts, and other governmental actors.

109. As a result, Plaintiff faces a real and immediate risk of ongoing and future harm, including continued reliance on these records in legal and governmental proceedings affecting her rights and interests.

110. Monetary damages alone are inadequate to remedy this continuing injury.

111. Plaintiff does not seek to interfere with any ongoing state court proceedings, but seeks only prospective relief directed at Defendants' recordkeeping practices and the continued maintenance and use of the records at issue.

112. Plaintiff seeks declaratory relief that Defendants' conduct violated her constitutional rights under the Fourteenth Amendment.

113. Plaintiff further seeks injunctive relief requiring Defendants to:

(a) Provide constitutionally adequate procedures for the neutral review, correction, annotation, or challenge of materially inaccurate official records;

(b) Implement and maintain policies and practices sufficient to ensure that known inaccuracies in official records are not maintained or relied upon without a meaningful opportunity for review and correction; and

(c) Take appropriate corrective action with respect to the records concerning Plaintiff, including correction, annotation, or other measures sufficient to prevent their continued use in a materially misleading manner.

**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.  Compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendants' conduct;

B.  Punitive damages against the individual Defendants, to the extent permitted by law;

C.  Declaratory relief that Defendants' conduct violated Plaintiff's rights under the United States Constitution;

D.  Injunctive relief requiring Defendants to:

(1)  implement constitutionally adequate procedures for the review, correction, annotation, or challenge of materially inaccurate official records; and

(2)  take appropriate corrective action with respect to the records concerning Plaintiff, including correction, annotation, or other measures sufficient to prevent their continued use in a materially misleading manner;

E.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

F.  Pre-judgment and post-judgment interest as allowed by law;

G.  Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

**IX. JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**/s/ Brian D. Wilcox**
Brian D. Wilcox
State Bar No. CA 244096
Brian D. Wilcox Law, PLLC
Southlake, Texas 76092
Telephone: 949-533-7530

25

Email: Brian@BrianDWilcoxLaw.com

ATTORNEY FOR PLAINTIFF